UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JAMES BREAUX, | |
| Plaintiff, | |
| v. | Civil Action No. |
| BATH IRON WORKS CORPORATION, | |
| Defendant. | |

**COMPLAINT**

**JURY TRIAL REQUESTED**

NOW COMES Plaintiff, James Breaux, by and through counsel, and complains against Bath Iron Works, Inc. d/b/a Bath Iron Works Corporation, as follows:

**SUMMARY OF THE ACTION**

1.     This is an action for (1) disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq,*, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 *et. seq.,* and the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4551, *et seq.*.; (2) race discrimination regarding a person's equal right to make and enforce contracts in violation of 42 U.S.C. § 1981;  (3) interference with rights to family and medical leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, and the Maine Family and Medical Leave Requirements Act ("Maine FMLRA"), 26 M.R.S. §§ 843, *et seq.*; and (4) retaliation or discrimination for exercising rights to family and medical leave under the FMLA, 29 U.S.C. § 2615, and the Maine FMLRA 26 M.R.S. § 843, *et seq.*

2.     James Breaux ("Plaintiff or "Mr. Breaux") injured his back while working at Bath Iron Works ("BIW," "Defendant," or "the Employer") on July 26, 2023. From that point on,

1

BIW pushed Mr. Breaux to work strenuous tasks contrary to restrictions associated with his injury and failed altogether to engage with Mr. Breaux regarding his requests for reasonable accommodation. As a result, Mr. Breaux's condition worsened.

3.      Following his injury, Mr. Breaux experienced degrading treatment from supervisors. The Defendant targeted Mr. Breaux, an African American man, by assigning strenuous tasks despite his back injury and request for other lighter work being performed by similarly situated nondisabled, white employees. Further, the Defendant's assigned Mr. Breaux degrading assignments and harassed him regarding those jobs, including by walking through a jobsite with him each day and pointing to trash he should pick up in front of colleagues.

4.      On or around October 30, 2023, Mr. Breaux exercised his FMLA and Maine FMLRA rights by applying for medical leave. Only 1-2 days later, BIW suspended Mr. Breaux and ultimately terminated his employment.

5.      As a result of BIW's unlawful termination, Mr. Breaux is seeking all available remedies, including back pay and benefits, compensatory and punitive damages, pre-judgment and post-judgment interest, reinstatement or, if impracticable, front pay, injunctive relief, and attorney's fees and costs.

## JURISDICTION AND PARTIES

6.      This court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1343(a)(4); pursuant to 29 U.S.C. § 2617; and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.      This court has venue pursuant to 28 U.S.C. § 1391(b) because the claims arose in this judicial district.

8.      Plaintiff James Breaux is a United States citizen and a resident of Morgan City, St. Mary Parish, Louisiana.

9.      Defendant Bath Iron Works is a corporation domiciled in the State of Maine, doing business and headquartered in Bath, Sagadahoc County, Maine.

10.     At all material times, Defendant was Mr. Breaux's "employer" as that term is defined in the ADA, Rehabilitation Act, MHRA, FMLA, and Maine FMLRA.

11.     Defendant suspended Mr. Breaux on November 1, 2023 and terminated him on November 26, 2023.

12.     Defendant had over 6000 employees at the time of Mr. Breaux's suspension and termination.

13.     Mr. Breaux filed a timely Complaint/Charge of Discrimination with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC") alleging unlawful disability discrimination on or about November 5, 2023.

14.     By letter dated April 29, 2024, the EEOC issued Mr. Breaux a "right-to-sue" letter with respect to Mr. Breaux's claims under the ADA. A copy of the right-to-sue letter is attached as Exhibit 1.

15.     Mr. Breaux received the right to sue letter on or about May 2, 2024.

16.     By a letter dated July 24, 2023, the MHRC issued Mr. Breaux a "right-to-sue" letter with respect to Mr. Breaux's claims under the MHRA. A copy of the right-to-sue letter is attached as Exhibit 2.

17.     Mr. Breaux has exhausted his administrative remedies for purposes of the claim set forth in this Complaint.

## JURY TRIAL DEMAND

18.    Mr. Breaux requests a trial by jury for all claims and issues for which a jury is permitted.

## FACTUAL ALLEGATIONS

19.    Bath Iron Works (BIW) is a shipbuilding company based and located on the Kennebec River in Bath, Maine.

20.    Bath Iron Works is a subsidiary of defense company General Dynamics, Inc. that builds warships.

21.    The Bath Iron Works shipyard is around 65 acres in size.

22.    At all times relevant to the complaint, Gaeton Breton served as BIW's Labor Relations Specialist.

23.    At all times relevant to the complaint, James Legasse served as Assistant Foreman in the shipyard.

24.    At all times relevant to the complaint, Sam Buswell served as Mr. Breaux's immediate supervisor at the shipyard.

### Mr. Breaux's Employment History with Defendant

25.    Mr. Breaux started working for Bath Iron Works on July 12, 2021, as a sandblaster.

26.    Although hired as a sandblaster, Mr. Breaux soon commenced working as a Preservation Technician or "P-10" for BIW.

27.    As a Preservation Technician, or "P-10," Mr. Breaux's role consisted largely of painting ships, as well as sanding walls, cleaning up work areas within vessels being constructed

at the shipyard, including to remove debris and hazardous material, sanding walls, and using grinders.

28.    In or around May 2022, Mr. Breaux was promoted to "work leader."

29.    Before working at BIW, Mr. Breaux had prior experience as a blaster-painter.

30.    Mr. Breaux was a qualified, hard-working employee.

31.    Mr. Breaux was paid $28.25 per hour as a second-shift P-10 and worked a full time, 40 hours per week schedule.

**Mr. Breaux's Workplace Injury and
Requests for Reasonable Accommodation**

32.    In 2023, Mr. Breaux was diagnosed with a lower spinal column injury to five vertebral bodies, L1-L5, a condition that causes him severe pain and restricts his mobility. To treat his condition, Mr. Breaux was prescribed physical restrictions, physical therapy, and later nerve ablation.

33.    Mr. Breaux's impairment continues to this day.

34.    On July 26, 2023, Mr. Breaux suffered a lower back injury at BIW after a shift of lifting up deck plates at the bottom of a ship to clean the bilge.

35.    In the bilge, Mr. Breaux was cleaning dust and debris underneath sections of floor called "deck plates" or "diamond plate squares."

36.    Some deck plates were removeable, and others were not.

37.    To clean under the deck plates, Mr. Breaux had to lift deck plates and reach or crawl into tight spaces to clean the space beneath them, called the bilge.

38.    Mr. Breaux hoisted himself back out of the tight area and tore his protective coveralls on a piece of metal.

39.     When Mr. Breaux bent down to change his protective coveralls, he realized his back was injured.

40.     That same day, Mr. Breaux sought treatment at the Mid Coast Hospital Emergency Department.

41.     Mr. Breaux's treating emergency room physician diagnosed his back injury as a muscular injury and gave Mr. Breaux the following limitations for two (2) days: no bending, twisting, crouching, crawling, or ladders; no lifting over 10 pounds; and minimal stairs, not to exceed nine minutes per hour.

42.     From July 26, 2023, forward, on multiple occasions Mr. Breaux requested that BIW provide him with reasonable accommodation, beginning with his frequent medical visits to BIW's medical team and subsequent discussions with his supervisors on August 8, August 16, August 31, 2023.

43.     The day after his injury on July 27, 2023, Mr. Breaux returned to work.

44.     After Mr. Breaux returned to work, the symptoms of his back injury worsened.

45.     Mr. Breaux consulted BIW medical staff regarding his condition and appropriate work restrictions, and BIW medical staff issued work restrictions.

46.     Around one week after the injury, Mr. Breaux began physical therapy onsite at BIW, before his shift.

47.     On July 31, 2023, BIW's medical team altered Mr. Breaux's limitations to no bending, twisting, or lifting over twenty pounds; and only occasional ladders, kneeling, crouching, and crawling, not to exceed twenty-one minutes per hour.

48. Still, Mr. Breaux's condition worsened, and on August 2, 2023, he again visited the Emergency Department at Mid Coast Hospital, where his treating physician suggested he may be experiencing sciatic nerve issues.

49. On August 3, 2023, Mr. Breaux followed up with BIW's medical team, and BIW put Mr. Breaux out of work until August 8, 2023.

50. On August 8, 2023, Mr. Breaux returned to work after a BIW medical checkup on August 7, 2023, with restrictions of no lifting over 20 pounds; minimal stairs, not to exceed nine minutes per hour; and occasional bending, twisting, kneeling, and crawling, not to exceed twenty-one minutes per hour.

51. Mr. Breaux's supervisor, Sam Buswell, grew agitated with Mr. Breaux's limitations.

52. On many occasions, including on August 8, August 16, August 31, September 19, and November 1, 2023, supervisors including Mr. Buswell insisted that Mr. Breaux could work beyond his restrictions.

53. When Mr. Breaux protested, Mr. Buswell refused to discuss the components of a given task and why that task was possible with Mr. Breaux's restrictions.

54. On several occasions, including August 8, August 16, August 31, 2023, Mr. Breaux requested reasonable accommodations, including modification of an assigned task, different task assignments, or transfer to an available alternative position.

55. Mr. Buswell repeatedly refused to engage with Mr. Breaux regarding modifying task assignments, redistributing task assignments amongst the P-10 team, and transfer.

56. Additionally, Mr. Buswell engaged in degrading and harassing behavior toward Mr. Breaux regarding his injury and assigned Mr. Breaux to degrading tasks.

57.     For example, on multiple occasions, Mr. Buswell targeted Mr. Breaux as being lazy and unintelligent and humiliated Mr. Breaux in front of colleagues, including on August 31, 2024.

58.     Mr. Breaux is an African American man.

59.     On multiple occasions, including August 8 and August 16, 2023, Mr. Buswell assigned Mr. Breaux to strenuous jobs in excess of Plaintiff's restrictions.

60.     For example, the very first day that Mr. Breaux returned to work on Aug. 8, 2023, Mr. Buswell assigned Mr. Breaux to vacuum up water outside on the pavement outside as it was raining, an unusual, strenuous, and degrading job.

61.     Mr. Buswell instructed Mr. Breaux push and pull a large vacuum made from a heavy metal oil drum attached to a pallet around the shipyard in the rain to vacuum rainwater.

62.     In addition to being strenuous, the job assignment was unusual and degrading in that BIW had never previously assigned employees to do this task. Typically, employees walked around puddles, or if it rained significantly, BIW would place wooden boards down for workers to pass through any wet areas.

63.     On that day, another employee in the welding division commented to Mr. Breaux that the assignment was unusual and ridiculous.

64.     When Mr. Buswell assigned the job to Mr. Breaux, Mr. Breaux said it would be difficult for him to push or pull around a large metal barrel full of water due to his recent injury and requested a different job assignment for the day.

65.     Mr. Buswell replied that Mr. Breaux could accomplish the task because his current restrictions listed lifting but not pulling and pushing.

66.     Mr. Breaux again expressed concern regarding the strenuous nature of the task and his recent injury. The job required strenuous work as well as bending and twisting, which were part of Mr. Breaux's current restrictions.

67.     Mr. Buswell asked only whether Mr. Breaux was refusing a job. Mr. Buswell did not discuss Mr. Breaux's injury and how BIW could work with him.

68.     Mr. Breaux complied and did the job.

69.     On August 16, 2023, Mr. Buswell again assigned Mr. Breaux a strenuous task, despite his injury, and Mr. Breaux further aggravated his back injury from repeated heavy lifting.

70.     That day, Mr. Buswell assigned Mr. Breaux to an eight-hour shift of heavy lifting up and down flights of stairs.

71.     Mr. Breaux was assigned to remove heavy electrical waste from a ship.

72.     For eight hours, Mr. Breaux carried heavy trash bags filled with wire clippings; the bags were around one-hundred-gallon bags and weighed up to or greater than one hundred pounds. Mr. Breaux spent the shift bending to lift bags out of bins, tying them up, and transporting the bags from the ship to a metal waste bin off the ship.

73.     At the time, Mr. Breaux's limitation included minimal bending.

74.     At the outset of the shift when Mr. Breaux was assigned this duty, Mr. Breaux talked to his Supervisor, Sam Buswell, and requested to work a less strenuous task due to his recent back injury.

75.     Mr. Breaux requested a task assignment that would place less stress on his back, such as paint pickup or hand-sanding.

76.     Mr. Breaux worked on a second-shift crew of ten or more other P-10s who could have been able to take the heavy lifting assignment.

77.     Each day, crew members are assigned a variety of tasks that mostly consist of painting and cleanup, and another task assignment was available on that day.

78.     Supervisor Buswell did not discuss alternatives with Mr. Breaux.

79.     Mr. Buswell refused to reassign Mr. Breaux to another task because his restrictions did not limit lifting heavy objects at the time.

80.     Mr. Buswell appeared agitated and asked whether Mr. Breaux was refusing a job, which could result in discipline.

81.     Mr. Breaux complied with the assignment and ultimately aggravated his back injury.

82.     Mr. Breaux lost mobility, and his condition restricted his bending and movement such that he could not put on his shoes the next day.

83.     On August 17, 2023, Mr. Breaux visited BIW's medical team, and they altered his restrictions back to no lifting over thirty pounds and minimal bending, no more than nine minutes per hour, and Mr. Breaux continued working.

84.     Mr. Breaux's supervisor continued to push limits with Mr. Breaux's injury by assigning him to strenuous jobs, rather than working with Mr. Breaux to discuss solutions.

85.     As a result, Mr. Breaux visited BIW medical as needed to alter his restrictions to prevent his back condition from worsening.

86.     On August 30, 2023, Mr. Breaux visited BIW's medical team, and they added and amended his restrictions to include no carrying over thirty pounds and to restrict twisting to minimal activity, not to exceed nine minutes per hour. Thus, his restrictions were no lifting or carrying over thirty pounds and minimal bending and twisting, not to exceed nine minutes per hour.

87.     The next day, on August 31, 2023, Mr. Breaux's supervisor assigned him to a task that involved significant bending and twisting, which Mr. Breaux could not perform with his restrictions.

88.     The assignment required Mr. Breaux to repeatedly bend down and lift up pieces of the metal deck flooring to expose the space underneath, lower himself to the floor-level, and twist his body to reach beneath the metal floor and remove large pieces of metal, bottles, and other debris.

89.     Because Mr. Breaux was familiar with the task and anticipated incompatibility with his restrictions, Mr. Breaux reminded Supervisor Buswell of his restrictions and requested another task so that he could work longer and get more done.

90.     Mr. Buswell assigned Mr. Breaux to the task anyway, without discussing appropriate alternative tasks or demonstrating techniques Mr. Breaux could use to work within his restrictions.

91.     Mr. Breaux complied and worked within his medical restrictions, which limited him to a maximum of nine minutes per hour of bending and twisting.

92.     Although Supervisor Buswell disagreed that Mr. Breaux's restrictions prevented him from performing the task, Mr. Buswell did not engage with Mr. Breaux while he was working on the task to discuss or suggest techniques that would bring Mr. Breaux within his restrictions.

93.     Instead, at the end of the night, Mr. Buswell became angry about Mr. Breaux's progress on the task and yelled at and belittled Mr. Breaux for his lack of progress in front of a colleague named Sabrina.

94. Mr. Breaux's condition worsened, and he requested an MRI through BIW medical.

95. On September 7, 2023, an MRI found Mr. Breaux had suffered an injury to five lumbar vertebral bodies, L1-L5.

96. After the MRI revealed the extent of Mr. Breaux's injury, medical providers revised his restrictions.

97. On September 8, 2023, BIW medical assigned Mr. Breaux new restrictions of no stairs; no lifting, carrying, pushing, or pulling over thirty pounds; minimal ladders, bending, twisting, not to exceed nine minutes per hour; and as necessary, to sit down for five-to-ten-minute periods every one to two hours.

98. Mr. Breaux's supervisors, including Mr. Buswell, grew frustrated with his restrictions and assigned him to tasks that were degrading or embarrassing relative to his job code.

99. Supervisors now assigned Mr. Breaux to clean trash from sections of the yard each shift, regardless of weather.

100. One colleague laughed and remarked that assigning a P-10 to such a task was embarrassing.

101. In front of Mr. Breaux's colleagues, Mr. Buswell often humiliated Mr. Breaux by requiring Mr. Breaux to walk the yard with him as he pointed at each piece of trash on the ground for Mr. Breaux to clean up. Mr. Buswell did this in front of other colleagues in a humiliating manner that implied Mr. Breaux was too incompetent to identify trash on the ground and pick it up.

102.    The assigned work—which included bending, carrying, and lifting—continued to take a toll on Mr. Breaux's condition.

103.    The new assignment required Mr. Breaux to pick up debris from shipways or sections of the shipyard every day, sorting through ordinary trash, hazardous material, and trade materials to be kept.

104.    The task put stress on his back condition and often exceeded his restrictions by requiring bending and lifting and carrying debris across the large shipyard.

105.    Mr. Breaux had to pick up trash, ranging from plastic and paper to heavy metal scraps, in one-hundred-gallon trash bags and carry bags across shipyard to a dumpster, without the aid of a cart or other device. Dumpsters are relocated in the shipyard throughout the shift, sometimes requiring extra walking.

106.    Mr. Breaux then carried salvageable trade materials to a designated area and hazardous material to a separate designated area.

107.    On days when an assigned area of the yard contained extra debris, Mr. Breaux occasionally completed remaining work the following day without issue, until he was disciplined by Assistant Foreman James Legasse.

108.    On September 19, 2023, Mr. Breaux's supervisor assigned him to clean an area under a ship, called a "shipway," and Assistant Foreman Legasse disciplined Mr. Breaux for failing to complete the job.

109.    The shipway is the area beneath a ship when it is jacked up in the shipyard.

110.    The area to be cleaned was around the size of a football field and contained a significant amount of debris.

111.    That day, Mr. Breaux cleaned up hazardous material, returned salvaged trade material, and bagged at least ten one-hundred-gallon bags of trash.

112.    At the end of Mr. Breaux's shift, there was still more debris to be cleaned from the football-field-sized area.

113.    Assistant Foreman Legasse became angry and interrogated Mr. Breaux about why he had not completed the task.

114.    Mr. Breaux was surprised and asked whether Mr. Legasse was joking with him because on days when an assigned area of the yard contained extra debris, Mr. Breaux occasionally completed remaining work the following day without issue.

115.    Legasse continued to interrogate Mr. Breaux and appeared to be angry.

116.    Mr. Breaux requested to have his union shop steward present for the conversation because he felt it was leading to discipline.

117.    As a union member, Mr. Breaux is entitled to have a shop steward present while being interrogated regarding potential discipline.

118.    Mr. Legasse refused to call the union shop steward and continued asking Mr. Breaux about the issue.

119.    Mr. Legasse said it was not his job to call a shop steward, and that Mr. Breaux may call the steward once their conversation was finished.

120.    In an angry and forceful tone, Mr. Legasse again asked Mr. Breaux why he did not complete the assignment and pushed him to reply with "no excuses."

121.    Fearing discipline and the tone of the conversation, Mr. Breaux repeated that he wanted the shop steward present before he discussed anything.

122.    Mr. Legasse said that Mr. Breaux did not meet production goals, and it would lead to discipline.

123.    Mr. Breaux reported the incident to a union representative who told Mr. Breaux they would file an unfair labor practice (ULP) charge about the issue.

124.    On October 2, 2023, Mr. Breaux sought care with primary care physician Dr. George Eyere at Martin's Point for his back injury and mental health impacts, including depression, related to the injury and stress at work.

125.    Dr. Eyere prescribed Mr. Breaux antidepressant medication after that appointment, and Mr. Breaux began taking medication soon after.

126.    On October 18, 2023, Mr. Breaux had a follow-up appointment regarding his back and mental health.

127.    On October 18, Mr. Breaux began the process of applying for family medical leave (FML)with his physician to take leave to rest due to his back injury and mental impacts related to the injury and stress at work.

128.    Mr. Breaux continued to experience degrading behavior by BIW supervisors. On October 19, 2023, Mr. Breaux's supervisors did not investigate his health status after he was exposed to smoke inhalation when he was trapped near a dumpster fire beneath a ship, and instead supervisors immediately assigned Mr. Breaux a new task.

129.    On that day, Mr. Breaux was assigned to clean a shipway area beneath a large ship, and Mr. Breaux was the only employee working beneath the ship; welders were working on the side of the ship.

130.    On that day, a dumpster fire broke out beneath the ship near where Mr. Breaux was working, and BIW evacuated workers from the area.

131.     While welders evacuated from the side of the ship, for five minutes Mr. Breaux was trapped underneath the ship with the dumpster fire and inhaled smoke.

132.     Once Mr. Breaux was able to evacuate, Mr. Buswell did not investigate Mr. Breaux's health status.

133.     Mr. Buswell simply assigned Mr. Breaux to a new cleaning job elsewhere.

134.     On or around Monday, October 30, 2023, Mr. Breaux applied for FML, and he planned to take leave shortly due to his back injury and mental impacts related to the injury and stress at work.

135.     On Tuesday, October 31, 2023, BIW medical assigned Mr. Breaux new work restrictions for the next 3 months: no lifting, carrying, pushing, or pulling over twenty pounds; minimal bending, twisting, walking, ladders, not to exceed nine minutes per hour; and allowance for a five-to-ten-minute rest or stretch break every one to two hours as necessary.

136.     For the first time, Mr. Breaux's restrictions included minimal walking.

137.     On Tuesday, when Mr. Breaux handed supervisors Buswell and Legasse his new restrictions from BIW medical, the two supervisors spoke to one another and laughed at the restrictions.

138.     Buswell and Legasse did not discuss the restrictions with Mr. Breaux and potential ways to accommodate Mr. Breaux.

139.     Instead, Mr. Buswell assigned Mr. Breaux a task that exceeded his restrictions of minimal bending, twisting, and walking, not to exceed nine minutes per hour.

140.     Because Mr. Breaux felt humiliated by how his boss interacted with him, including in front of colleagues, Mr. Breaux did not ask Mr. Buswell how he should accomplish the task within his restrictions.

141.    Mr. Breaux avoided confrontation and tried to do the task within his restrictions.

142.    After clocking in on Wednesday, November 1, 2023, Mr. Breaux walked nine minutes toward the meeting site to begin his shift.

143.    Because the length of the walk took more than nine minutes to complete, Mr. Breaux followed his medical restrictions from BIW by stopping to rest after nine minutes of walking.

144.    BIW labor relations employee Gaeton Breton approached Mr. Breaux and yelled, "You need to do your fucking job."

145.    Mr. Breaux reminded Mr. Breton of his walking restriction and that he could not walk any more that hour.

146.    Mr. Breton instructed Mr. Breaux to walk with Mr. Breton back where he had just walked from.

147.    When Mr. Breaux reminded Mr. Breton of his walking restriction, Mr. Breton said he knew Mr. Breaux's restrictions and yelled again, "Do your fucking job."

148.    Mr. Breton ordered Mr. Breaux to walk back to North Gate where he came from and to let Mr. Breton know if he needed a break.

149.    Mr. Breaux did not feel he had a choice and walked with Mr. Breton, who brought Mr. Breaux to the main office to suspend him.

150.    That day, Mr. Breton admitted to the Union that even though Mr. Breaux reminded Mr. Breton of his limitations, Mr. Breton ordered James to break his limitations.

151.    BIW suspended Mr. Breaux on November 1 through November 26, 2023, while it conducted an investigation for alleged misconduct.

152.    On November 26, 2023, BIW terminated Mr. Breaux.

153.    As a result, Mr. Breaux was prevented from taking FML and was unable to access worker's compensation.

## COUNT I

## ADA Failure to Accommodate

154.    Plaintiff repeats and realleges all the foregoing paragraphs as if repeated in full herein.

155.    Mr. Breaux lower spinal column injury is a disability under the ADA, Section 504, and MHRA.

156.    Mr. Breaux's lower back condition is a physical impairment that substantially limits, inter alia, the major life activities of walking, bending, lifting and carrying, climbing stairs, and working.

157.    Mr. Breaux's back condition impairs his health and mobility to a significant extent as compared to what is ordinarily experienced in the general population.

158.    The Defendant knew of Mr. Breaux was a person with a disability after Mr. Breaux injured his back at work, underwent medical evaluation at work, and required ongoing medical restrictions.

159.    On many occasions, Mr. Breaux communicated with Supervisors regarding his need for accommodation, including by requesting modified existing task assignments; alternative or lighter-duty task assignments amongst on-shift team members with the same P-10 job code, available alternative positions, and ultimately medical leave.

160.    The Defendant denied these repeated requests for accommodation, failing to discuss them altogether, in violation of the ADA.

161.    Mr. Breaux is a qualified individual with a disability in that he can perform the essential functions of the job he held with the Defendant or other positions with BIW, with or without reasonable accommodations.

162.    Defendant further failed to engage in an interactive process with Mr. Breaux to determine appropriate accommodations. From the time of Mr. Breaux's injury to his suspension, Defendant failed to engage in the interactive process with Mr. Breaux to discuss reasonable accommodation including modifying his task assignments or transfer to another available position.

163.    Instead, the Defendant assigned Mr. Breaux to strenuous tasks that frequently exceeded his medical restrictions.

164.    When Mr. Breaux worked on those assignments within the bounds his medical restrictions, BIW suspended and fired him.

165.    The conduct displayed by Mr. Buswell and other supervisors is evidence of retaliatory animus for Mr. Breaux exercising ADA and FMLA rights.

166.    The immediacy with which the Defendant fired Mr. Breaux *one day* after he sought proper workplace accommodation for his recent diagnosis and *two days* after he applied for medical leave is evidence of retaliatory animus.

167.    Mr. Breaux's requests for accommodation were a substantial factor in the decision to terminate his employment.

168.    BIW violated the ADA by failing to engage in the interactive process and by denying Mr. Breaux a reasonable accommodation.

## COUNT II

### Section 504 Failure to Accommodate

169.     Plaintiff repeats and realleges all of the foregoing paragraphs as if repeated in full herein.

170.     BIW violated Section 504 by failing to engage in the interactive process and by denying Mr. Breaux reasonable accommodation.

## COUNT III

### Maine Human Rights Act Failure to Accommodate

171.      Plaintiff repeats and realleges all of the foregoing paragraphs as if repeated in full herein.

172.     BIW violated the MHRA by failing to engage in the interactive process and by denying Mr. Breaux a reasonable accommodation.

## COUNT IV

### Unlawful Suspension and Termination in Violation of the ADA

173.     Plaintiff repeats and realleges all of the foregoing paragraphs as if repeated in full herein.

174.     BIW discriminatorily suspended Mr. Breaux in violation of the ADA on November 1, 2023, *the day after* Mr. Breaux requested new limitations on October 31, 2023.

175.     Soon after, BIW discriminatorily terminated Mr. Breaux on November 26, 2023, in violation of the ADA.

## COUNT V

### Unlawful Suspension and Termination in Violation of Section 504

176.    Plaintiff repeats and realleges all of the foregoing paragraphs as if repeated in full herein.

177.    BIW discriminatorily suspended Mr. Breaux on November 1, 2023, the day after he requested new limitations, in violation of Section 504.

178.    Soon after, BIW discriminatorily terminated Mr. Breaux on November 26, 2023, in violation of Section 504.

## COUNT VI

### Unlawful Suspension and Termination in Violation of the MHRA

179.    Plaintiff repeats and realleges all of the foregoing paragraphs as if repeated in full herein.

180.    BIW discriminatorily suspended Mr. Breaux on November 1, 2023, the day after he requested new limitations, in violation of the MHRA.

181.    Soon after, BIW discriminatorily terminated Mr. Breaux on November 26, 2023, in violation of the MHRA.

## COUNT VII

### Section 1981 Race Discrimination

182.    Plaintiff repeats and realleges all of the foregoing paragraphs as if repeated in full herein.

183.    Defendant's conduct constitutes unlawful racial discrimination against Mr. Breaux, an African American man, in making and enforcing contracts in violation of 42 U.S.C. § 1981.

184.    BIW discriminated against Mr. Breaux by, *inter alia*, targeting Mr. Breaux, harassing him, disciplining him, and ultimately terminating him, unlike similarly situated white employees.

185.    BIW discriminated against Mr. Breaux by assigning him degrading tasks and speaking to him in a degrading manner.

186.    BIW suspended and ultimately terminated Mr. Breaux because of his race.

187.    Defendant created a racially hostile work environment.

188.    Race was a motivating factor in Defendant's decisions.

189.    Defendant, via its agent supervisors, intentionally discriminated against Mr. Breaux on the basis of race.

190.    The injury would not have occurred but for Mr. Breaux's race.

191.    Defendant's discriminatory actions towards Mr. Breaux on the basis of his race were in violation of Section 1981.

## COUNT VIII

## Interference with Rights Under FMLA

192.    Plaintiff repeats and realleges all the foregoing paragraphs as if repeated in full herein.

193.    The FMLA (29 U.S. Code § 2615(a)) prohibits an employer from interfering with, restraining, or denying the exercise of, or the attempt to exercise, any FMLA right.

194.    Mr. Breaux's back injury was a serious health condition under the FMLA.

195.    On or around October 30, 2023, Mr. Breaux requested FML.

196.    Two days later, on November 1, 2023, BIW suspended Mr. Breaux's employment and later terminated him on November 26, 2023.

197.    By denying Mr. Breaux FML leave, BIW willfully interfered with his exercise or attempt to exercise his FMLA right in violation of the FMLA.

**COUNT IX**

**Interference with Rights Under Maine FMLRA**

198.    Plaintiff repeats and realleges all the foregoing paragraphs as if repeated in full herein.

199.    The Maine FMLRA prohibits an employer from interfering with, restraining, or denying the exercise of, or the attempt to exercise, any FMLRA right. 26 M.R.S. § 847(1).

200.    The Maine FMLRA further prohibits an employer from discharging, fining, suspending, expelling, disciplining, or in any other manner discriminating against any employee for exercising any FMLRA right. 26 M.R.S. § 847(2).

201.    Mr. Breaux's back injury was a serious health condition under the FMLRA.

202.    On or around October 30, 2023, Mr. Breaux requested FML.

203.    Two days later, on November 1, 2023, BIW suspended Mr. Breaux's employment and later terminated him on November 26, 2023.

204.    By denying Mr. Breaux FML leave, BIW willfully interfered with his exercise or attempt to exercise his FMLA right.

205.    By disciplining, suspending, and ultimately terminating Mr. Breaux after he requested FML leave, BIW discriminated against Mr. Breaux for his exercise or attempt to exercise his FMLA right in violation of the Maine FMLRA.

## COUNT X

## FMLA Retaliation

206.    Plaintiff repeats and realleges all the foregoing paragraphs as if repeated in full herein.

207.    The FMLA (29 U.S. Code § 2615(a)) prohibits an employer from discriminating or retaliating against an employee for having exercised or attempted to exercise any FMLA right.

208.    On or around October 30, 2023, Mr. Breaux requested FML.

209.    Two days later, on November 1, 2023, BIW suspended Mr. Breaux's employment and later terminated him.

210.    By denying Mr. Breaux FML leave, BIW willfully retaliated against Mr. Breaux for his exercise or attempt to exercise his FMLA right in violation of the FMLA.

## COUNT XI

## Maine FMLRA Discrimination

211.    Plaintiff repeats and realleges all the foregoing paragraphs as if repeated in full herein.

212.    The Maine FMLRA prohibits an employer from discharging, fining, suspending, expelling, disciplining, or in any other manner discriminating against any employee for exercising any FMLRA right. 26 M.R.S. § 847(2).

213.    Mr. Breaux's back injury was a serious health condition under the FMLRA.

214.    On or around October 30, 2023, Mr. Breaux requested FML.

215.    Two days later, on November 1, 2023, BIW suspended Mr. Breaux's employment and later terminated him on November 26, 2023.

216.     By disciplining, suspending, and ultimately terminating Mr. Breaux after he requested FML leave, BIW wilfully discriminated against Mr. Breaux for his exercise or attempt to exercise his FMLA right in violation of the Maine FMLRA.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff requests that the Court grant the following relief:

A.      Enter Judgment in Plaintiff's favor on all counts;

B.      Declare Defendant's conduct to be in violation of Plaintiff's rights;

C.      Order Defendant to reinstate Plaintiff or alternatively award Mr. Breaux front pay and benefits;

D.      Award Mr. Breaux lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination and/or retaliation;

E.      Award equitable relief for back pay, benefits, and prejudgment interest on all counts;

F.      Award compensatory damages in an amount to be determined at trial on Counts I-VII;

G.      Award punitive damages in an amount to be determined at trial on Counts I-VII;

H.      Award nominal damages on all counts;

I.      Award liquidated damages equal to lost pay and benefits on Counts VIII-XI.

J.      Award liquidated damages of $100 per day on Counts IX and XI.

K.      Award attorney's fees, including legal expenses and costs, on all counts;

L.      Award prejudgment and post-judgment interest on all counts;

M.      Permanently enjoin Defendant from engaging in any employment practice which discriminates or retaliates against employees on the basis disability, race, or of exercising FMLA rights;

N.      Require that Defendant train all management level employees about the illegality of discrimination and retaliation;

26

O.      Require that Defendants train all management level employees on the protections afforded by the ADA, Section 504, MHRA, Section 1981, FMLA, and Maine FMLRA;

P.      Require that Defendant place a document in Plaintiff's personnel file which explains that they unlawfully terminated Plaintiff because of discrimination and retaliation; and

Q.      Grant to Plaintiff such other and further relief as may be just and proper.

Dated: July 25, 2024.

Respectfully submitted,

/s/ Jeffrey Neil Young
Jeffrey Neil Young Esq. Maine Bar No. 3874

/s/ Margaret M. O'Neil
Margaret M O'Neil, Esq. Maine Bar No. 10705

SOLIDARITY LAW, PLLC
9 Longmeadow Rd.
Cumberland Foreside, ME 04110
Jyoung@solidarity.law
Moneil@solidarity.law
Tel 207-844-4243

Counsel to Plaintiff James Breaux